UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

     - against -

JOSE HERNANDEZ-LORA,

               Defendant.

------------------------------------X

10 Cr. 776-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

      On March 8, 2011, Jose Hernandez-Lora ("Hernandez-Lora" or "Defendant") pleaded guilty to the following charges: (i) Count One: conspiracy to Commit Hobbs Act Robberies, in violation of 18 U.S.C. § 1951; (ii) Counts Two to Sixteen: committing and attempting to commit robberies, in violation of five kilograms and more of cocaine, in violation of 18 U.S.C. § 1951 and 1952; (iii) Count Seventeen: conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1); 841(b)(1)(A); and 846; (iv) Count Eighteen: carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S>C. § 924(c)(1)(A)(i).

      For the reasons set forth below, Hernandez-Lora will

1

be sentenced to a term of sixty months.

## Prior Proceedings

Hernandez-Lora was named in an 18-count felony Information filed in the Southern District of New York. Count One charges that from November 2001 through February 2009, in the Southern District of New York and elsewhere, Defendant conspired to commit robberies of individuals engaged in or believed to be engaged in narcotics trafficking. Counts Two through Sixteen charge that on the dates set forth below, in the Southern District of New York and elsewhere, Defendant committed the certain robberies and attempted robberies of persons engaged in, or believed to be engaged in, narcotics trafficking and/or other activities affecting interstate commerce. Count Seventeen charges that from 2002, up to and including about 2007, in the Southern District of New York and elsewhere, Defendant, did distribute and possess with intent to distribute 5 kilograms and more of cocaine in violation of 21 USC 841(b)(1)(A). Count eighteen charges that from November 2001, up to and including February 2009, in the Southern District of New York and elsewhere, Defendant did possess a firearm, and did aid and abet the use, carrying and possession of a firearm, during and in the

2

course of the robbery conspiracy described above in Count One.

On March 8, 2011, defendant Hernandez-Lora appeared before the Honorable Ronald W. Sweet and allocuted to his criminal conduct as charged without the benefit of a plea agreement.

Hernandez-Lora's sentencing is currently scheduled for September 19, 2013.

## The Sentencing Framework

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed —

>> (A) to reflect the seriousness of the offense,

> to promote respect for the law, and to
> provide just punishment for the offense;

> (B)   to afford adequate deterrence to criminal
> conduct;

> (C)   to protect the public from further crimes of
> the defendant; and

> (D)   to provide the defendant with needed
> educational or vocational training, medical
> care, or other correctional treatment in the
> most effective manner;

> (3)   the kinds of sentences available;

> (4)   the kinds of sentence and the sentencing range
> established for —

> (A)   the applicable category of offense committed
> by the applicable category of defendant as
> set forth in the guidelines . . .;

> (5)   any pertinent policy statement . . . [issued
> by the Sentencing Commission];

> (6)   the need to avoid unwarranted sentence
> disparities among defendants with similar
> records who have been found guilty of
> similar conduct; and

> (7)   the need to provide restitution to any victims of
> the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find

all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.  See

Crosby, 397 F.3d at 114-15.

**The Defendant**

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to Hernandez-Lora's personal and family history.

**The Offense Conduct**

The following description draws from the PSR. The specific facts of the underlying conduct are adopted as set forth in that document.

Hernandez-Lora was born in the Dominican Republic on July 13, 1981. Sponsored by his mother, Hernandez-Lora obtained a green card and entered the United States at some point in 1996 or 1997. After arriving in this country, he helped his uncle "Bola" distribute marijuana by making deliveries to other dealers. In about 1998, Hernandez-Lora began working as a lookout for "Pinto," a friend from the Dominican Republic, who sold powder and crack cocaine at 159th Street between Amsterdam Avenue and Broadway. Hernandez-Lora stopped working for Pinto in about 2000, when he started selling cocaine for "Tony," this

time on 169th Street between Amsterdam and Audubon Avenues.

While working for "Tony," Hernandez-Lora was arrested three times - on April 30, 2002, May 8, 2002, and May 22, 2002 - on charges of criminal possession of narcotics with intent to sell and trespassing.   On August 13, 2002, Hernandez-Lora pleaded guilty, in New York Supreme Court, New York County, to two separately indicted counts of Attempted Criminal Possession of a Controlled Substance with Intent to Sell, and was later sentenced to five years' probation on each conviction. At some point in 2002, Hernandez-Lora stopped working for "Tony."

From approximately 2002 until 2006 or 2007, Hernandez-Lora worked for "Jose Luis," a/k/a "Ché," selling one kilogram of cocaine a month in Upper Manhattan.   He delivered cocaine to people he knew at their homes.   He did not have a spot on the street for making retail sales.   Around 2006 or 2007, Hernandez-Lora stopped selling drugs.

Over the course of his involvement in drug trafficking, Hernandez-Lora conspired to distribute more than (1) five kilograms of powder cocaine, (2) fifty grams of crack cocaine, and (3) fifty kilograms of marijuana.

6

Between 2006 or 2007 and 2008 or 2009, Hernandez-Lora lived in Florida, working as a window installer and office cleaner. In 2008 or 2009, he returned to New York, so that he could participate in a robbery of a drug dealer in the Bronx. Hernandez-Lora has been involved in numerous armed robberies and attempted armed robberies, generally serving as the "tipster" based on his drug trafficking contacts.

Most of the robberies involved the use of weapons and restraints. Two involved violence committed by other members of the crew: one victim was struck in the head, another was kicked. One robbery victim, who was restrained and strangled, died as a consequence of the attempted robbery. More specifically, the below information details the 2009 attempted Robbery on Honeywell Avenue in which a victim was killed.

In the winter of 2007-08, Jose Luis Ulloa Fermin ("Fermin") provided a tip to a robbery crew ("Robbery Crew-1") about Edwin Molina, a prospective target. According to Fermin, Mr. Molina stored large sums of cash in safes at his home, a private house located at 2066 Honeywell Avenue, Bronx, New York. Fermin believed that the money consisted of drug-trafficking

proceeds and possibly also proceeds from a local convenience store that Mr. Molina owned. Based on the information provided by Fermin, Robbery Crew-1 burglarized Mr. Molina's home in the fall of 2007. Robbery Crew-1 consisted of Tommy Germosen ("Germosen") and three other experienced robbers who were able to steal approximately $550,000 in cash from Mr. Molina's home.

Approximately four months later, in early 2008, Germosen organized a group of experienced robbers ("Robbery Crew-2") to plan and carry out a second robbery of Mr. Molina's home. Robbery Crew-2 consisted of Wilson Ramirez ("Ramiez"), Juan Rondon ("Rondon"), Modesto Vasquez-Gomez ("Vasquez-Gomez"), Jose Rodriguez-Saez ("Rodriguez-Saez"), and Hernandez-Lora. All the members of Robbery Crew-2 attended meetings to plan the robbery, during which they discussed (i) their plans to break into and enter Mr. Molina's home, (ii) their intention to bring firearms to the robbery and possibly use them to carry out the robbery, and (iii) their belief that the money stored in Mr. Molina's home was proceeds from narcotics sales or Mr. Molina's grocery store.

In the evening of April 16, 2008, Rondon, Rodriguez-Saez, Germosen, Vasquez-Gomez, Hernandez-Lora, and Ramirez

arrived at Mr. Molina's home, removed the bars that protected the kitchen window, and entered the house.   Hernandez-Lora carried a revolver and Ramirez carried a bb gun into the house. Hernandez-Lora and Ramirez attempted to restrain Mr. Molina, but a struggle ensued.   Germosen and Rondon then entered through the front door.   Germosen took the revolver, pointed the gun at Mr. Molina, and told him to get down.    Mr.  Molina  followed Germosen's instructions. Rondon punched Mr. Molina in the head. Germosen and Ramirez then tied Mr. Molina's wrists and ankles with a coaxial cable and a wire hanger.   Mr. Molina having been restrained, Germosen, Ramirez, and Hernandez-Lora searched the house for the drug money or grocery store proceeds. While they searched, Rondon stood guard over Mr. Molina, throwing a blanket over his head and generally manhandling him.   Among other things, Rondon held the back of Mr. Molina's neck while Mr. Molina was lying on his stomach on the floor, forcing his head to the ground.

After approximately 15 minutes of searching the house, Germosen, Ramirez, and Hernandez-Lora were unable to locate any cash.   They returned to the first floor, where they saw that Rondon had covered Mr. Molina with a blanket. Germosen and Hernandez-Lora took Mr. Molina's pulse, which they felt only

faintly.   Ramirez and Germosen also threw water on Mr. Molina in an effort to revive him.  Realizing the dire condition of Mr. Molina, Germosen, Ramirez, Hernandez-Lora, and Rondon fled the house, climbed into Rodrguez-Saez's sedan, drove away, and from a short distance Germosen used a public payphone to call 911. The dispatcher took down the wrong address, and emergency assistance did not reach Mr. Molina that night.

Jeffrey Molina, one of Mr. Molina's sons, found his father's body the next morning on April 17, 2008 at around 9:00 a.m.  Emergency services were called to the scene and responding officers found Mr. Molina lying face down on the floor, with his ankles bound by coaxial cable and a metal wire hanger.   An autopsy was conducted by the New York City Medical Examiner's Office on April 17, 2008.  The autopsy report lists Mr. Molina's cause of death as "compression of neck," and the manner of death as "homicide."  Neck muscle hemorrhages were detected, and the victim's ankles were bound with wire and cable at the time of the examination.  Mr. Molina's death was estimated to have taken place between 5:30 p.m. on April 16, 2008, and 9:10 a.m. on April 17, 2008.  Mr. Molina was 66 years old at the time of his death.

In addition to the robberies noted in Counts Two through Sixteen, the defendant was involved in six additional robberies. The bolded robberies in the chart below are not noted in the Information but are considered relevant conduct:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | Feb. 2009 | 165th St. between Webster and Park, Bronx | Robbery | 2 kg cocaine | $15,000 | none | Victim restrained<br><br>Police imperson-ation |
| 2 | Feb. 2005 | 173 St. between Wadsworth & St. Nicholas, Manhattan | Robbery | 2 kg cocaine | nothing | 2 handguns | Police imperson-ation |
| 3 | Summer 2004/2005 | 173 St. & Fort Washington, Manhattan | Robbery | $63,000 | $5,000 | Handgun | none<br><br>Police imperson-ation |
| 4 | Summer 2004/2005 | 170 St. & Broadway, Manhattan | Robbery, | 1½ kg cocaine | $10,000 | None | none<br><br>Police imperson-ation |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | Nov.- Dec. 2003/2 004 | Rest Area, New Jersey | Robbery , Police Imperso nation | $63,000 | $12,000 | One firearm | none<br><br>Police imperson -ation |
| 6 | Winter 2003/2 004 | 165th St. & Broadway, Manhattan | Robbery , Police Imperso nation | 1 kg cocaine | $10,000 | none | none<br><br>Police imperson -ation |
| 7 | Winter 2003 | 152nd Street between Amsterdam & St. Nicholas, Manhattan | Robbery | $86,000 – $90,000 | $11,000 – $12,000 | 9 mm | 1 Female – bag over head, tied and kicked; 2 Females – tied |
| 8 | Winter 2002- 2003 | NJ/Newark | Robbery | $38,000 | $17,000 | none | Victim was kidnappe d and beaten |
| 9 | Winter 2001- 2002 | NJ/Newark | Theft | 1kg cocaine | $14,000 | none | none |

| 10 | Summer 2005 | 615 E. 173rd St., between Wadsworth & St. Nicholas, Manhattan | Robbery | Jewelry, clothing, 2,500 ecstasy pills, $2,500, 1½ kg cocaine | nothing | 38 Revolver | Victim hit over the head and tied up with a hanger. |
| 11 | **2005** | **Bronx** | **Fraud (sold sham)** | **$12,000** | **$2,000** | **none** | **none** |
| 12 | 2009 | 162nd St. & Grand Concourse, Bronx | Robbery | Jewelry | $300 in jewelry | none | none |
| 13 | 2003-2004 | 155th St & Edgecombe, Manhattan | Robbery | 800 g cocaine | $500 | none | none |
| 14 | 2009 | Tremont & Honeywell, Bronx | Attempted robbery | Jewelry | nothing | .38 gun; Prop gun | see separate write up on Honeywell Avenue robbery |
| 15 | Winter 2008 | Huntspoint Ave., Bronx | Attempted robbery | nothing | nothing | none | none |
| 16 | **March 2008** | **Westchester Ave & Rowland Ave, Bronx** | **Attempted robbery** | **nothing** | **nothing** | **none** | **none** |

13

| 17 | 2008 | 137 St. & Amsterdam, Manhattan | Attempted robbery | nothing | nothing | none | none |
|----|------|-------------------------------|-------------------|---------|---------|---------|------|
| 18 | 2009 | 188th St. & St. Valentine, Bronx | Attempted robbery | nothing | nothing | Crowbar | none |
| 19 | 2009 | 189th St. & St. Nicholas, Manhattan | Attempted robbery | nothing | nothing | none | none |
| 20 | 2005 | Main Street, Patterson, NJ | Attempted robbery | nothing | nothing | nothing | none |
| 21 | 2009 | 181st Street & Valentine, Bronx | Attempted Robbery | nothing | nothing | none | none |

Hernandez-Lora was arrested on September 1, 2010.


**<u>Victim Impact</u>**


The following information draws from the PSR.

14

Jeffrey Molina was interviewed both via telephone on June 26, 2012, and in person on July 16, 2012.   Jeffrey Molina indicated that, despite reports to the contrary, his father was not a drug dealer.   According to the victim's son, Mr. Molina was a very good businessman, who saved money as a young man and purchased buildings in the Bronx, where he started a number of legitimate businesses.

Jeffrey Molina was profoundly affected by finding his father dead, and he noted that he still sees the scene in his head to this day.   He has never, though, sought any mental health counseling or treatment in order to help him deal with this trauma and to his knowledge, neither has his brother, Michael.   Jeffrey Molina stated that he was not close with his father when he was younger, but he was working on their relationship, and they were growing closer, prior to his father's death.   Jeffrey Molina was 20 years old at the time of his father's homicide.

Jeffrey Molina also stated that his own son, who is now three years old, will never know his grandfather.   He feels that everyone involved in the robbery attempt of his father is responsible for his father's death, and that all of them should

15

be sent to prison for as long as possible. Jeffrey Molina advised that he is still extremely angry about what happened, and will likely not be able to attend the sentencing of the defendant, for fear of his own reaction to seeing the man who he feels murdered his father.

## The Relevant Statutory Provisions

Counts One through Sixteen have a maximum term of imprisonment of 20 years, on each count, pursuant to 18 U.S.C. 1951. Count Seventeen mandates a minimum term of 20 years' imprisonment up to life, pursuant to 21 U.S.C. §§ 841(b)(1)(A), 846, and enhanced penalties pursuant to 21 U.S.C. § 851. Count Eighteen carries a mandatory five years' imprisonment, to run consecutive to any other sentence imposed, pursuant to 18 U.S.C. § 924(c)(1)(A)(i) and (2).

If a term of imprisonment is imposed on Counts One through Sixteen, the Court may impose a term of supervised release of not more than three years, on each count, pursuant to 18 U.S.C. § 3583(b)(2). On Count Seventeen, a term of at least ten years' supervised release is required if a sentence of imprisonment is imposed, pursuant to 21 U.S.C. §§ 846,

841(b)(1)(A), and enhanced penalties pursuant to 21 USC 851.   If a term of imprisonment is imposed on Count Eighteen, the Court may impose a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1).   Such terms of supervised release run concurrently, pursuant to 18 USC 3624(e).

The defendant is not eligible for probation on Counts 17 and 18, because each count is a Class A felony, pursuant to 18 U.S.C. § 3561(a)(1), and precluded by statute pursuant to 18 U.S.C. § 3561(a)(2). The defendant is not eligible for probation on the remaining counts because he is being sentenced at the same time to a term of imprisonment on the above counts, pursuant to 18 U.S.C. § 3561(a)(3).   The defendant is also not eligible for probation on the remaining counts because he is being sentenced at the same time to a term of imprisonment on the aforementioned counts, pursuant to §5B1.1(b)(3).

The maximum fine for Counts 1-16 and18 is $250,000 on each count, pursuant to 18 USC 3571.   For Count Seventeen, the maximum fine is $20 million, pursuant to 21 USC 841(b)(1)(A) and 846.   A special assessment of $1,800 is mandatory, pursuant to 18 USC 3013.   Subject to the defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to

17

the Government of any imprisonment, probation, or supervised release pursuant to §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,407.78 to be used for imprisonment, a monthly cost of $286.11 for supervision, and a monthly cost of $2,180.27 for community confinement. Restitution is not an issue in this case.

As a Dominican national, the defendant is a deportable alien.

## The Guidelines

The November 1, 2012 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes pursuant to § 1B1.11(a).

Pursuant to § 3D1.2 and §3D1.4, Count One is grouped with Counts Two through Sixteen pursuant to § 3D1.2(b), and each of the robberies and attempted robberies charged in Counts 2 through Sixteen will be grouped separately, forming Groups One through Fifteen. Count Seventeen, which charges conspiracy to distribute and possess with intent to distribute cocaine, crack

cocaine, and marijuana, will form Group Sixteen.

Pursuant to §2K2.4(b), because the defendant was convicted of violating 18 USC 924(c) (1)(A)(i), the guideline sentence is the minimum term of imprisonment required by statute, and therefore, no specific offense characteristic for possessing, brandishing, using, or discharging a firearm is applicable to the underlying offenses (robberies), nor shall Chapter Three or Four apply. The sentence imposed on Count 18 must be served consecutively to any sentence imposed on the other counts. The minimum statutory term of imprisonment for Count Eighteen is 5 years, pursuant to 18 USC 924(c)(1)(A)(i).

With respect to Group One, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a). A two-level increase in the offense level is warranted because the victim was physically restrained during the commission of the robbery, pursuant to §2B3.1(b)(4)(B). The victim sustained a loss of $15,000, which results in an increase of one level, pursuant to §2B3.1(b)(7)(B). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Two, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Three, the guideline for a violation of 18 U.S.C. § 1951 (Conspiracy to Hobbs act Robbery) is found at §2B3.1. Section 2B3.1(c)(1) provides that if a victim was killed under circumstances that would constitute First Degree Murder, we are to utilize §2A1.1 in calculating the offense level. As such and pursuant to §2A1.1(a), the base offense level is 43.

With respect to Group Four, the guideline for robbery is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Five, the guideline for robbery is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Six, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a). Although firearms were carried, no adjustment under §2B3.1(b)(2) applies, as the defendant was convicted under 18 U.S.C. § 924(c). A two-level increase in the offense level is warranted because the victim was handcuffed during the commission of the robbery, pursuant to §2B3.1(b)(4)(B). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Seven, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a). Although firearms were carried, no adjustment under §2B3.1(b)(2) applies, as the defendant was convicted under 18 USC 924(c). Pursuant to §2B3.1(b)(3)(A), a two-level increase is applicable because the

21

victim sustained bodily injury.   A two-level increase in the offense level is warranted because the victim was physically restrained with a hanger during the commission of the robbery, pursuant to §2B3.1(b)(4)(B).  Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Eight, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).  The victim sustained a loss of $63,000 in cash, which results in an increased by two levels, pursuant to §2B3.1(b)(7)(C).   Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Nine, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).   The victim sustained a loss of $10,000 in cash, which results in no increase in the offense level, pursuant to §2B3.1(b)(7)(A). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level,

pursuant to §2B3.1(b)(6).

With respect to Group Ten, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).   The victim sustained a loss of $500 in cash, which results in no increase in the offense level, pursuant to §2B3.1(b)(7)(A). Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Eleven, The guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).   Although firearms were carried, no adjustment under §2B3.1(b)(2) applies, as the defendant was convicted under 18 U.S.C. § 924(c).   The victim sustained a loss of $63,000 in cash, which results in a two level increase to the offense level, pursuant to §2B3.1(b)(7)(C).   Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Twelve, the guideline for a

23

violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).   Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Thirteen, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).   Although firearms were carried, no adjustment under §2B3.1(b)(2) applies, as the defendant was convicted under 18 U.S.C. § 924(c). Pursuant to §2B3.1(b)(3)(A), a two-level increase is applicable because victim sustained bodily injury by being kicked.   A two-level increase in the offense level is warranted because the victim was physically restrained during the commission of the robbery, pursuant to §2B3.1(b)(4)(B).   Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6). Because the loss was between $86,000 to $90,000, the offense level is increased by two levels, pursuant to §2B3.1(b)(7)(C).

With respect to Group Fourteen, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides

24

for a base offense level of 20, pursuant to §2B3.1(a).  Pursuant to §2B3.1(b)(3)(A), a two-level increase is applicable because the victim sustained bodily injury. Pursuant to §2B3.1(b)(4)(A), a four-level increase is applicable because the victim was kidnapped.  The victim sustained a loss of $38,000 in cash, which results in a one level increase in the offense level, pursuant to §2B3.1(b)(7)(B).  Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Fifteen, the guideline for a violation of 18 U.S.C. § 1951 is found in §2B3.1 which provides for a base offense level of 20, pursuant to §2B3.1(a).  Because the taking of a controlled substance was an object of the offense, the offense level is increased by one level, pursuant to §2B3.1(b)(6).

With respect to Group Sixteen, the guideline for violations 21 U.S.C. §§ 846, 841(b)(1)(A) is found in §2D1.1(a)(3).  The base offense level is determined by the quantity of controlled substance involved in the offense. Section 2D1.1, Application Note 8B provides that when different controlled substances are involved in an offense, each of the

25

substances should be converted to its marijuana equivalent, and the total amount should be used to obtain the combined offense level. According to the Government, the defendant is responsible for distributing five kilograms or more of cocaine (which converts to 1,000 kilograms of marijuana); 50 grams of cocaine base (which converts to 178.55 kilograms of marijuana) and 50 kilograms of marijuana (which does not have to be converted). Therefore, the total marijuana equivalent for all the drugs is 1,228.55 kilograms which corresponds to an offense level of 32, pursuant to §2D1.1(c)(4).

The combined adjusted offense level of all counts is forty-three. Because of the Defendant's timely notification of his intention to plead guilty, thus allowing the Government to allocate its resources more efficiently, and because the aforementioned base offense level is 16 or greater, pursuant to §3E1.1(a) and (b), the offense is reduced three levels from forty-three to forty. Based on a total offense level of forty and a Criminal History Category of one, the guideline range of imprisonment is 292 months to 365 months. This is to be followed by a mandatory minimum and consecutive term of at least sixty months as required by Count Eighteen.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

As set forth below, the Defendant in this case has rendered substantial assistance to the Government in the investigation and prosecution of other persons.  Thus, in light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), the factors set forth in § 3553(a), and the Government's submission on behalf of the Defendant pursuant to U.S.S.G. § 5K1.1, a downward departure from the sentencing Guidelines is warranted in this case.

**Section 5K1.1 Factors**

Section 5K1.1 of the Sentencing Guidelines sets forth

27

five non-exclusive factors that sentencing courts are encouraged to consider in determining the appropriate sentencing reduction for a defendant who has rendered substantial assistance: (1) "significance and usefulness" of assistance (§5K1.1(a)(1)); (2) "truthfulness, completeness, and reliability" of information and testimony (§5K1.1(a)(2)); (3) "nature and extent" of assistance (§5K1.1(a)(3)); (4) "any injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§5K1.1(a)(4)); and (5) "timeliness" of assistance (§5K1.1(a)(5)).

The Government has determined that Hernandez-Lora has provided extraordinary assistance in this case. As an initial matter, Hernandez-Lora initiated contact with the police and confessed by his own volition. Unlike most cooperators, Hernandez-Lora did not assist the Government in order to be paid or obtain leniency; he came in voluntarily. Specifically, in January 2010, Hernandez-Lora contacted, on his own initiative, an officer with the New York City Police Department ("NYPD") and confessed to committing several robberies. Shortly thereafter, Hernandez-Lora participated in a robbery "sting" with NYPD officers, which resulted in the arrest of three individuals, each of whom had been involved in over a dozen armed robberies.

In addition to participating in "sting" and other covert operations with law enforcement officers, Hernandez-Lora also provided detailed information about violent robberies that he committed in the past. One of those robberies was a home invasion that resulted in the death of an elderly man who was at home during the robbery. At the time he provided this information, the NYPD had already designated the homicide a cold case. Because of the information Hernandez-Lora provided, all six participants in that robbery have been brought to justice. The government attests that his readiness to testify likely resulted in the entry of guilty pleas from all of these criminals, greatly conserving judicial resources.

Furthermore, pertinent to the fourth factor in U.S.S.G. § 5K1.1(a), Hernandez-Lora's cooperation came at a high risk to his own safety. First, he participated in face-to-face meetings with very dangerous individuals, and second, the risk of retaliation in this case was extremely high as he was incarcerated with those about whom he had provided information and his former associates routinely used violence to intimidate witness cooperation. Despite this risk, Hernandez-Lora never resisted the questions or tasks put to him by the agents or the

Government.    In addition, Hernandez-Lora in his plea allocution and written letter to the court has demonstrated recognition of and responsibility for the severity of his offenses, as well as extreme remorse for his criminal behavior.

With respect to the first three factors in U.S.S.G. § 5K1.1(a), the government attests that Hernandez-Lora's information was highly useful, complete and truthful, and very extensive.  The government thus characterizes Hernandez-Lora's assistance as extraordinary as measured by all five factors set forth above in U.S.S.G. § 5K1.1(a).

Based on the Government's submission and Hernandez-Lora's critical assistance to the efforts of law enforcement, a sentence of 60 months' imprisonment, which is a downward departure from the Guideline range, is warranted.

**The Sentence**

For the instant offense, Defendant Hernandez-Lora will be sentenced to a term of imprisonment of sixty months.

As a result of committing offenses in violation of 18

U.S.C. § 1951, alleged in Counts One through Sixteen of this
Information, Hernandez-Lora, shall forfeit to the United States,
pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all
property, real and personal, that constitutes or is derived from
proceeds traceable to the commission of the offense.

As a result of committing the controlled substance
offense alleged in Count Seventeen of this Information,
Hernandez-Lora, shall forfeit to the U.S. pursuant to 21 U.S.C.
§ 853, any and all property constituting or derived from any
proceeds the defendant obtained directly or indirectly as a
result of the violation and  all property used or intended to be
used in any manner or part to commit and to facilitate the
commission of the violation alleged in Count Thirteen of the
Information, including a sum of money representing the amount of
proceeds obtained as a result of the offense.

A special assessment of $1,800, payable to the United
States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification
at the sentencing hearing scheduled for September 19, 2013.

It is so ordered.

New York, NY
September 16 , 2013

ROBERT W. SWEET
U.S.D.J.